IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SKY D. STOODT, | ) | CASE NO.  3:25-CV-00201-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Sky Stoodt ("Plaintiff" or "Stoodt"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In April 2018, Stoodt filed an application for POD, DIB, and SSI, alleging a disability onset date of June 30, 2017, and claiming he was disabled due to depression, anxiety, functional capacity seriously limited in self-direction, and functional capacity seriously limited in interpersonal skills.  (Transcript

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

("Tr.") 15, 66, 78.)  The applications were denied initially and upon reconsideration, and Stoodt requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On December 12, 2019, an ALJ held a hearing, during which Stoodt, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On December 26, 2019, the ALJ issued a written decision finding Stoodt was not disabled.  (*Id.* at 15-27.)  The ALJ's decision became final on August 17, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

Stoodt filed a Complaint to challenge the Commissioner's final decision in this Court, and on March 10, 2022, this Court reversed the ALJ's decision and remanded the case for a new hearing.  (*Id.* at 883-84.)

On September 6, 2022, the ALJ held another hearing, during which Stoodt, represented by counsel, and an impartial VE testified.  (*Id.* at 760.)  On October 27, 2022, the ALJ issued a written decision finding Stoodt was not disabled.  (*Id.* at 760-71.)

Stoodt filed a Complaint to challenge the Commissioner's final decision in this Court, and on August 18, 2023, this Court reversed the ALJ's decision and remanded the case for a new hearing.  (*Id.* at 1448.)

On August 27, 2024, a new ALJ held a hearing, during which Stoodt, represented by counsel, and an impartial VE testified.  (*Id.* at 1352.)  On October 18, 2024, the ALJ issued a written decision finding Stoodt was not disabled.  (*Id.* at 1352-66.)

On February 3, 2025, Stoodt filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 8-9.) Stoodt asserts the following assignment of error:

> (1) The ALJ violated 20 C.F.R. § 404.1520c during the evaluation of Ms. Conrad's treating source opinions. The ALJ neglected to adequately address the supportability factor by ignoring the overwhelming amount of support Ms. Conrad provided within the four corners of her own medical source statements.

(Doc. No. 6.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Stoodt was born in August 1992 and was 32 years-old at the time of his administrative hearing (Tr. 1352, 1364), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has at least a high school education.  (Tr. 1364.)  He has no past relevant work.  (*Id*.)

### B.    Relevant Medical Evidence[2]

On October 17, 2017, Stoodt saw Judy Brenek, CNP, for a check up and medication management. (*Id.* at 451.)  Stoodt reported he did not have a job and he was depressed as a result.  (*Id.*)  He told Brenek he was doing well on Effexor, but upon questioning Stoodt told Brenek he was "better but not[] in full remission."  (*Id.*)  Brenek and Stoodt discussed increasing his Effexor dose to see if that helped more. (*Id.*)  On examination, Brenek found Stoodt well groomed.  (*Id.*)  Stoodt's diagnosis consisted of severe episode of recurrent major depressive disorder without psychotic features and Brenek adjusted his medication.  (*Id.* at 451-52.)

On November 28, 2017, Stoodt saw Brenek for medication management and reported a day of rage, a day of irritability, and a bad Thanksgiving.  (*Id.* at 635.)  On examination, Brenek found Stoodt distressed, depressed, agitated, and anxious, with a flat affect and good eye contact.  (*Id.*)  Brenek adjusted Stoodt's medication.  (*Id.* at 635-36.)

On January 30, 2018, Stoodt saw Brenek for follow up and reported his depression medication was "not working" and he was "getting angry at times."  (*Id.* at 447.)  On examination, Brenek found Stoodt

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, as Stoodt challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Stoodt's mental impairments.

3

well groomed, alert and oriented, and in no acute distress.  (*Id.*)  Brenek provided Stoodt with depression information and continued him on Effexor.  (*Id.* at 448.)

On June 5, 2018, Stoodt saw Michael Wuebker, Ph.D., for a consultative psychological examination. (*Id.* at 488.)  Stoodt told Dr. Wuebker he was applying for disability because of his depression and anxiety. (*Id.*)  Stoodt reported a work history where attendance was not a problem and he "'was a very hard worker.'" (*Id.* at 489.)  He struggled with focus when he became nervous.  (*Id.*)  He thought others were against him and judging him, and he was always worried about being embarrassed at work.  (*Id.*) He got along okay with his supervisors and coworkers, but he mostly kept to himself.  (*Id.*)  He had never been fired from a job.  (*Id.* at 490.)  Stoodt told Dr. Wuebker he had been depressed most of his life, but he had never been hospitalized for mental health issues.  (*Id.*)  Stood reported intermittent mental health counseling as a juvenile.  (*Id.*)  His current medications "'t[ook] the edge off'" of his mental health symptoms.'"  (*Id.*)  He endorsed a lack of motivation, sleep problems, daily suicidal ideation for the past two weeks, periods of anxiety where he felt like he was having a heart attack, headaches, nausea, and worrying about appointments.  (*Id.* at 491.)  He told Dr. Wuebker that he tried to avoid people and that he hated people. (*Id.*)  He got nervous around his family and feared social situations.  (*Id.*)  He avoided family gatherings, and if he did go, he only stayed for a little while.  (*Id.*)  He spent his days watching TV and interacting with his cat.  (*Id.* at 492.)  He did not talk or text on the phone and he had no friends.  (*Id.*)  He enjoyed writing and drawing, and sometimes he looked for jobs.  (*Id.*)  He left the house once or twice a month. (*Id.*)  He shopped once a month, although he would "sometimes shut down depending on how many people" were at the store.  (*Id.*)  He became nervous in stores.  (*Id.*)

On examination, Dr. Wuebker found Stoodt had a clean and neat appearance, cooperative behavior, and adequate eye contact.  (*Id.* at 490.)  Dr. Wuebker noted Stoodt "needed to be redirected several times to the question at hand."  (*Id.*)  Stoodt became more anxious as the examination progressed.

4

(*Id.*)  Dr. Wuebker further found normal speech, logical and coherent thought process, a "somewhat depressed" mood, restricted affect, and full orientation.  (*Id.* at 491.)  Dr. Wuebker noted Stoodt was "somewhat paranoid, believing that others are judging him and thinking the worst of him."  (*Id.*)  Stoodt demonstrated adequate insight and judgment and appeared to be functioning in the average range of cognition.  (*Id.* at 492.)  Dr. Wuebker diagnosed Stoodt with major depressive disorder, recurrent, severe, and social anxiety disorder.  (*Id.* at 493.)  Dr. Wuebker opined that Stoodt could "understand and apply instructions appropriately for one step and a few complex workplace instructions."  (*Id.*)  Dr. Wuebker further opined that Stoodt's mental health issues would "negatively affect" his ability to concentrate, persist, maintain pace, perform simple and multistep tasks, and respond to work pressures.  (*Id.*)  Dr. Wuebker further opined that Stoodt would have difficulty responding to supervision and coworkers.  (*Id.*)

On July 10, 2018, Stoodt saw Brenek for medication management and reported continued anxiety and depression.  (*Id.* at 663.)  Stoodt told Brenek he was "better than when he had previously stopped taking his medication but [was] still experiencing anxiety and depression."  (*Id.*)  Stoodt reported an anxiety attack and "blow up" a few weeks earlier.  (*Id.*)  He told Brenek he did not feel like doing anything, rarely left his home, and had given up looking for a job.  (*Id.*)  He reported suicidal thoughts but no plan and no intention of carrying them out as his mother needed him.  (*Id.*)  On examination, Brenek found Stoodt depressed, anxious, and agitated, as well as alert, oriented, and well groomed, with a flat affect and good eye contact.  (*Id.*)  Brenek adjusted Stoodt's medication.  (*Id.* at 664.)

On April 16, 2019, Stoodt saw Brenek for follow up and reported night terrors, suicidal thoughts, and feeling tired all day despite getting a full night's sleep.  (*Id.* at 670.)  On examination, Brenek found Stoodt well groomed, depressed, and distressed, with a normal affect and good eye contact.  (*Id.*)  Brenek adjusted Stoodt's medication.  (*Id.* at 671.)

On September 24, 2019, Stoodt saw Brenek for a wellness exam and reported his mother had lost

most of her income and that he felt hopeless.  (*Id.* at 748-49.)  Brenek discussed places where Stoodt could get help and noted Stoodt's "affect brightened when he was given options of things that might help them out in the meantime."  (*Id.* at 749.)  On examination, Brenek found Stoodt well groomed, depressed, and anxious, with a flat affect and good eye contact.  (*Id.*)

On October 1, 2019, Stoodt saw Carly Springer, LPC, to develop a therapy care plan.  (*Id.* at 738.)  On examination, Springer found Stoodt appropriately dressed with cooperative behavior, normal speech, euthymic mood, full range of affect, appropriate insight, logical thought, and no impairment in intellectual functioning.  (*Id.*)

On November 5, 2019, Stoodt saw Springer for counseling and reported having a "'near death experience'" because of a gas leak in their house.  (*Id.* at 742.)  Since then, Stoodt complained of feeling like he had been losing his mind, as well as angry and violent, and complained of "'suffering'" and experiencing neck pain, back pain, and vertigo.  (*Id.*)  On examination, Springer found good hygiene, cooperative behavior, normal speech, euthymic mood, full range of affect, appropriate insight, and no impairment in intellectual functioning.  (*Id.*)

On December 3, 2019, Stoodt saw Brenek for follow up and reported he was "unable to work due to his anxiety and depression."  (*Id.* at 746.)  He could not work around more than one person and "just thinking about going to work increases his anxiety."  (*Id.*)  Stoodt told Brenek he was "very uncomfortable around people he does not know," and while he was going to counseling, he had not seen any improvement.  (*Id.*)  On examination, Brenek found Stoodt well groomed, depressed, alert, and oriented, with a normal affect and good eye contact, although Brenek noted Stoodt had "been a long time patient" and his heartrate "still climbs at visit."  (*Id.*)  Brenek started Stoodt on Zoloft.  (*Id.*)

On February 11, 2020, Stoodt saw Ashley Conrad, CNP, to establish care and reported fatigue, decreased concentration, anxiety with difficulty breathing, chest pain or discomfort, and rapid heartbeat that

interfered with social activities, and depression with feelings of hopelessness/worthlessness and loss of pleasure from usual activities.  (*Id.* at 1317.)  Stoodt told Conrad he had taken Zoloft before, but it caused him to have "'black out rage.'"  (*Id.*)  Stoodt endorsed social anxiety and past psychiatric hospitalization. (*Id.*)  Conrad noted Stoodt was "very anxious" during the appointment, as he was fidgeting and picking at his skin.  (*Id.*)  He was currently taking Effexor but did not think it was helping much.  (*Id.* at 1318.)  On examination, Conrad found full orientation, normal cognitive functioning, normal appearance, dysphoric and anxious mood, flat and quiet affect, normal thought process, and suicidal ideation.  (*Id.* at 1320.)  Conrad started Stoodt on Depakote and Venlafaxine.  (*Id.* at 1321.)

On March 10, 2020, Conrad wrote a letter stating she had seen Stoodt that day and that "due to [Stoodt's] uncontrolled medical conditions he is unable to work or attend classes at this time."  (*Id.* at 1024.) Conrad stated Stoodt would be reevaluated in six months.  (*Id.*)

On April 1, 2020, Stoodt saw LPC Springer for a psychosocial diagnostic assessment to demonstrate "his difficulty with social interactions that make it difficult for him to complete the required '25 hours needed' to get food assistance."  (*Id.* at 1028, 1035.)  Stoodt reported socializing only with his mother and that he had more irritation, he did not like people, and his social skills had deteriorated.  (*Id.* at 1029.)  On examination, Springer found appropriate appearance, cooperative behavior, normal speech, euthymic mood, full range of affect, logical thought process, intact cognition/intellectual functioning, and appropriate insight and judgment.  (*Id.* at 1030.)  Stoodt reported showering regularly.  (*Id.*)  Srpinger diagnosed Stoodt with chronic adjustment disorder with anxiety and depression and referred him to individual counseling and community psychiatric support services.  (*Id.* at 1033-34.)

On June 14, 2020, Conrad completed a Mental Medical Source Statement and opined that Stoodt had extreme limitations in the following areas: accept instruction from or respond appropriately to criticism from supervisors or superiors; work in coordination with or in proximity to others without distracting them or

7

exhibiting behavioral extremes; respond appropriately to coworkers or peers; relate to the general public and maintain socially appropriate behavior; work in coordination with or in proximity to others without being distracted by them; maintain attention and concentration for more than brief periods of time; perform and production levels expected by most employers; respond appropriately to changes in the work setting; behave predictably, reliably, and in an emotionally stable manner; and tolerate customary work pressures.  (*Id.* at 1025-27.)  Conrad opined that Stoodt had marked limitations in the following areas: process subjective information accurately and use appropriate judgment and carry through instructions and complete tasks independently.  (*Id.* at 1025-26.)  Conrad stated that her opinions regarding Stoodt's capacity for social interaction would change if he had only minimal contact or interaction with others, and explained as follows: "Patient's anxiety severely limits his ability to leave his home, and it makes it very hard to interact with others.  If he was able to find a job with no contact with others, he would do better.  Although, his severe anxiety makes it near impossible to interview for a job."  (*Id.* at 1025.)  Conrad further opined that Stoodt would miss five or more days of work a month and that his condition was likely to deteriorate under stress, particularly the strss of full-time work.  (*Id.* at 1027.)  Conrad explained: "When patient leaves his home and is around other people, it causes panic attacks.  For his appointments at the office, he needs to be roomed immediately to avoid being in the lobby around other people because he experienced a severe panic attack the first couple of visits."  (*Id.*)

On August 13, 2020, Stoodt saw Conrad for follow up and reported his anxiety and depression continued to be bad.  (*Id.* at 1238.)  He told Conrad he almost had a breakdown when he went to Walmart, as it was very crowded, and he began to feel angry.  (*Id.*)  Stoodt was unsure if Buspirone was helping, and agreed to increase the dose.  (*Id.*)  The smallest thing ruined his day, and he did not feel that Vibryd and Risperdone had helped his depression.  (*Id.*)  Conrad stopped Vibryd and Risperidone, increased Buspar, and started Stoodt on Latuda.  (*Id.*)

8

On November 11, 2020, Stoodt saw Conrad for follow up and reported that sleep issues made his irritability worse.  (*Id.* at 1174.)  Much of his irritability stemmed from his neighbors.  (*Id.*)  Stoodt told Conrad hydroxyzine made him too drowsy, and he did not want to keep taking it.  (*Id.*)  He felt Zoloft had been helpful and it decreased his anxiety somewhat, although he thought he could benefit from a higher dose.  (*Id.*)  Stoodt felt Latuda had also been helpful.  (*Id.*)  Conrad increased Stoodt's Zoloft dosage.  (*Id.* at 1178.)

On December 7, 2020, Stoodt saw Conrad for follow up and reported "doing well" and feeling "stable at the moment."  (*Id.* at 1165.)  Stoodt only felt anxious if he had to leave the house.  (*Id.*)  He was sleeping well, despite his uncomfortable bed.  (*Id.*)  Conrad noted Stoodt was to follow up in one month after Stoodt returned from a vacation to Kentucky to visit family.  (*Id.*)

On February 15, 2021, Stoodt saw Conrad for follow up and reported doing all right.  (*Id.* at 1142.)  He thought the increase in Latuda had been helpful, as it kept him from getting too angry.  (*Id.*)  He told Conrad he'd had a few stressful days in the past week, and he'd been out of the house three to four times in the past week, which was also stressful.  (*Id.*)  Stoodt reported getting a new cat, and it was keeping him up at night; as a result, he was napping during the day, although he was not oversleeping like he had before.  (*Id.*)

On March 30, 2021, Stoodt saw Conrad for follow up and reported doing well; "[t]hings [were] surprisingly stable" and Stoodt felt "well balanced."  (*Id.* at 1124.)  He told Conrad he had been working on writing a book, was listening to music again, and was working out on one of his video games.  (*Id.*)  Stoodt felt stable enough to follow up in three months.  (*Id.*)  On examination, Conrad found Stoodt well groomed with a euthymic mood, normal affect, normal thought process, normal thought content, and suicidal intent or ideation.  (*Id.* at 1126.)

On July 14, 2021, Stoodt saw Conrad for follow up and reported tiredness and decreased

concentration.  (*Id.* at 1108.)  He told Conrad things had been manageable until he "got some not so good news from Social Security" the day before.  (*Id.*)  He had been feeling a little on edge since then.  (*Id.*)  Stoodt endorsed a fluctuating mood and reported he felt fine if he stayed home.  (*Id.*)  Conrad made no changes to Stoodt's medications, and Stoodt was to follow up in four weeks.  (*Id.*)

On August 13, 2021, Stoodt saw Conrad for follow up and reported doing well on his medication.  (*Id.* at 1099.)  He told Conrad he'd been less anxious.  (*Id.*)  Conrad noted Stoodt was smiling that day.  (*Id.*)

On October 31, 2021, Stoodt saw Conrad for follow up and reported things had not been going well.  (*Id.* at 1087.)  He told Conrad a family member had died recently, and it was the anniversary of his grandfather's death.  (*Id.*)  These events disrupted his mood and caused him to feel down.  (*Id.*)  He had not been working out and had been less active.  (*Id.*)  His landlord recently increased the rent.  (*Id.*)  Stoodt endorsed low energy, sleep issues, racing thoughts, intermittent anxiety, and distractibility.  (*Id.* at 1087-88.)  On examination, Conrad found normal mood, behavior, thought content, thought process, attitude, and affect.  (*Id.* at 1089.)  Conrad recommended some vitamins that may help Stoodt's mood and energy levels before making any medication changes.  (*Id.* at 1087.)

On November 3, 2021, Stoodt saw Conrad for follow up and reported having more energy since taking the vitamins Conrad recommended.  (*Id.* at 1080.)  Conrad noted Stoodt's anxiety and depression were manageable.  (*Id.*)

On March 2, 2022, Stoodt saw Conrad for follow up and reported "doing ok."  (*Id.* at 1071.)  Stoodt endorsed increased anxiety and a few panic attacks, which Conrad noted seemed to have been triggered by some dental appointments and procedures.  (*Id.*)  They discussed increasing Stoodt's Zoloft dose.  (*Id.*)  On examination, Conrad found normal mood, appropriate appearance, appropriate behavior, normal attitude, and normal affect.  (*Id.* at 1073-74.)

On October 5, 2022, Stoodt saw Conrad for follow up and reported increased anxiety because of

waiting for his disability case to be finalized and worrying about another denial of benefits.  (*Id.* at 1702.) He felt he may need to increase his medications.  (*Id.*)  Conrad explained his increased anxiety was situational, and Stoodt would be doing okay if not for the uncertainty of his disability application.  (*Id.*) Stoodt agreed that if he was approved for disability, "he would likely no longer experience current symptoms."  (*Id.*)  Conrad discussed nonpharmacological methods for managing anxiety, and noted she would hold off or any medication changes for now.  (*Id.*)  On examination, Conrad found normal mood, normal appearance, appropriate behavior, normal attitude, and normal affect.  (*Id.* at 1705.)

On January 6, 2023, Stoodt saw Conrad for follow up and reported increased anxiety and depression after his disability application was denied.  (*Id.* at 1691.)  Stoodt felt the agency lied and did not look at the evidence provided, and he was frustrated since he had been fighting his claim for so long.  (*Id.*)  Conrad noted it seemed the denial was because he was not under the care of a psychiatrist; Stoodt had declined a psychiatry referral in the past because it was hard from him to engage and open up to new people.  (*Id.*) Stoodt now understood he needed to see a psychiatrist, and Conrad provided him with information on how to establish care with a psychiatrist at Coleman.  (*Id.*)

On July 21, 2023, Stoodt saw Jessica Ramirez, LISW, and reported increased depression and anxiety.  (*Id.* at 1677.)  He felt his medications were not helping at all.  (*Id.*)  He told Ramirez he had been punching himself and was angry about it.  (*Id.*)  His mom was working more, and he was by himself more. (*Id.*)  Stoodt reported staying in and sleeping all the time.  (*Id.*)  He told Ramirez he had stopped working on his book and all he did was sit around and eat.  (*Id.*)  He also felt angrier lately.  (*Id.*)  On examination, Ramirez found anxious and depressed mood, tired appearance, worried affect, normal thought content, and normal thought process.  (*Id.* at 1679.)

On September 13, 2023, Stoodt saw Conrad for follow up and reported seeing TV ads for Trintellix and wanting to try it.  (*Id.* at 1672.)  On examination, Conrad found abnormal grooming, noting green

11

spots/patches on Stoodt's skin "from not bathing for 4+ months," and recurrent suicidal ideation.  (*Id.* at 1675.)

On October 4, 2023, Stoodt saw Ramirez and reported doing okay.  (*Id.* at 1655.)  He felt a little more optimistic.  (*Id.*)  Some days he managed his anxiety and depression well, and other days he felt more down.  (*Id.*)  On examination, Ramirez found anxious mood, tired appearance, worried and anxious affect, restless motor activity, appropriate eye contact, "not meticulous" grooming, normal thought process, normal thought content, and intact insight.  (*Id.*)

On November 8, 2023, Stoodt saw Conrad for follow up and reported feeling like himself again after starting Trintellix.  (*Id.* at 1649.)  He denied any needs or concerns.  (*Id.*)  On examination, Conrad found abnormal grooming, noting green spots/patches on Stoodt's skin "from not bathing for 4+ months," and recurrent suicidal ideation.  (*Id.* at 1653.)

On March 1, 2024, Stoodt saw Conrad for follow up and reported his anxiety and depression had been bad lately.  (*Id.* at 1638.)  When he first started Trintellix, he felt like himself again, but now it wasn't working as well.  (*Id.*)  They discussed increasing Stoodt's Trintellix dose.  (*Id.*)  On examination, Conrad found abnormal grooming, noting green spots/patches on Stoodt's skin "from not bathing for 4+ months," and recurrent suicidal ideation.  (*Id.* at 1642.)

On April 23, 2024, Stoodt saw Conrad for follow up and reported increased depression.  (*Id.* at 1626.)  He felt his medication wasn't working and that the increase in Trintellix made him feel worse.  (*Id.*)  Stoodt told Conrad he was angered by things that had no direct impact on him.  (*Id.*)  Conrad noted: "Patient doesn't really seem motivated to improve his mental health.  When a potential solution is presented to him, he finds a reason why it will not work for him or why he cannot do it.  He's not willing to take a break from the internet, not willing to do counseling, and nor willing to consider any sort of psychiatry."  (*Id.* at 1627.)  Stoodt reported intrusive thoughts about wanting to hurt people when he was around others, although he

12

would not act on it.  (*Id.*)  Conrad noted Stoodt seemed "very irritable and upset during today's visit."  (*Id.*)  On examination, Conrad found a tearful and angry affect and recurrent suicidal ideation.  (*Id.* at 1630.)

On September 6, 2024, Conrad completed another Mental Medical Source Statement.  (*Id.* at 1747-49.)  Conrad opined that Stoodt had extreme limitations in the following areas: accept instruction from and respond appropriately to criticism from supervisors or superiors; work in coordination with or in proximity to others without being distracted by them; behave predictably, reliably, and in an emotionally stable manner; maintain personal appearance and hygiene; and tolerate customary work pressures.  (*Id.* at 1747-48.)  Conrad further opined that Stoodt had marked limitations in the following areas: work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; respond appropriately to coworkers or peers; relate to the general public and maintain socially appropriate behavior; perform and complete work tasks in a normal work day or work week at a consistent pace; process subjective information accurately and use appropriate judgment; carry through instructions and complete tasks independently; maintain attention and concentration for more than brief periods of time; perform at production levels expected by most employers; respond appropriately to changes in the work setting; remember locations, workday procedures, and instructions; and be aware of normal hazards and take necessary precautions.  (*Id.*)  In support of Conrad's opined limitations regarding Stoodt's social interaction with others, Conrad explained: "Patient has not worked in many years due to his severe anxiety and fear of being around people/being in public."  (*Id.* at 1747.)  Conrad further opined Stoodt would miss five or more days a month and that his condition would likely deteriorate under stress, particularly the stress of full-time work.  (*Id.* at 1749.)  In support, Conrad explained: "Patient has not been able to cope effectively with even slight change.  He is not well in social settings, has significant agoraphobia."  (*Id.*)

**C.      State Agency Reports**

On June 12, 2018, Kristen Haskins, Psy.D., reviewed the file and opined that Stoodt had a mild limitation in his ability to understand, remember, or apply information and moderate limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 70, 82-83.)  Dr. Haskins further opined Stoodt could "complete short cycle tasks in a setting that does not have fast pace demand."  (*Id.* at 73, 85.)  Stoodt "should avoid large group interaction (10+ people)" and "should have brief, superficial interaction with others."  (*Id.*)  Dr. Haskins further opined:

> Claimant can work within a set routine where major changes are explained in advance and gradually implemented to allow the claimant time to adjust to the new expectations.  The claimant's ability to handle routine stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards.

(*Id.* at 74, 86.)

On October 7, 2018, on reconsideration, Jaime Lai, Psy.D., affirmed Dr. Haskins' findings regarding the Paragraph B criteria.  (*Id.* at 98, 112.)  Dr. Lai further opined Stoodt could "carry out 1-3 step short cycle tasks without strict production or pace requirements."  (*Id.* at 100, 114.)  Stoodt was "capable of brief, superficial interaction with others, but should not be required to interact with large groups (10+ people)." (*Id.* at 101, 115.)  Dr. Lai affirmed Dr. Haskins' opinion that:

> Claimant can work within a set routine where major changes are explained in advance and gradually implemented to allow the claimant time to adjust to the new expectations.  The claimant's ability to handle routine stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards.

(*Id.*)

**D.      Hearing Testimony**

During the August 27, 2024 hearing, Stoodt testified to the following:

- He lives with his mother.  (*Id.* at 1379.)  His mother works.  (*Id.* at 1380.)

14

- He can read, write, and sign his name.  (*Id.*)  He can count change with some difficulty.  (*Id.*)  He can manage a digital bank account.  (*Id.* at 1381.)  He holds a valid driver's license, but his mother drives him places.  (*Id.*)  He is physically capable of performing his own self-care, but he does not do so because of his depression.  (*Id.*)

- He cannot work because he is not motivated to do things he likes to do, even small things like writing or playing video games.  (*Id.*)  He doesn't care about what goes on around him.  (*Id.* at 1382.)  He doesn't do anything but sit on the couch, and he has gained 150 pounds in the past five years as a result.  (*Id.*)  He gets panic attacks when he is around people.  (*Id.*)  He gets nervous and feels like he's going to be sick.  (*Id.*)  His chest tightens and he gets cold sweats.  (*Id.*)  He struggles to take care of himself; as a result, he has a lot of dental problems, and his skin is covered in yellowish green patches.  (*Id.*)  He has not been to a family gathering in eight years.  (*Id.*)  When he is out in public and there's a lot of people, he gets violent and wants to attack or hurt people so they get out of his way, and he can get someplace quiet and safe.  (*Id.*)  He naps two to three times a day for two to three hours at a time.  (*Id.*)  He gets nervous leaving the house and he gets claustrophobic when he is in the car.  (*Id.*)  He hasn't been to a restaurant or grocery store since December.  (*Id.*)  The last time he went to a restaurant, he had a panic attack and had to leave.  (*Id.*)  If he has an upcoming appointment, he starts to get anxious a week before.  (*Id.*)  His anxiety worsens as the appointment gets closer.  (*Id.* at 1382-83.)  He struggles to talk for long periods of time.  (*Id.* at 1383.)  He cannot go anywhere alone.  (*Id.* at 1388.)  He has to have his mom with him, as she keeps him grounded.  (*Id.*)  The last time he went to a restaurant and grocery shopping with his mom, she had to talk him down from a panic attack and he was able to hide behind her.  (*Id.* at 1388-89.)  She's the only thing that keeps him from "losing it."  (*Id.* at 1389.)  He has suicidal thoughts two to three times a month.  (*Id.*)

- His doctor prescribes his mental health medication.  (*Id.* at 1383.)  He just started seeing a therapist a month ago.  (*Id.*)  He was in middle school the last time he saw a therapist because he doesn't like to talk to strangers or be in "close quarters" with them.  (*Id.*)  He sees his current therapist over the phone.  (*Id.*)

- He spends a typical day putting something on YouTube and letting it run on auto play for most of the day.  (*Id.* at 1385.)  It's difficult for him to pay attention to things.  (*Id.*)  He takes naps "to speed up time and just escape reality."  (*Id.*)  When his mom gets home, they watch TV together.  (*Id.*)  He never goes outside and gets "panicky" just thinking about doing so.  (*Id.*)

- His mother gets groceries at Walmart, and if he needs anything, she goes and gets that after work.  (*Id.*)  He only talks to his mom; he doesn't have any friends.  (*Id.*)  He used to write and play video games, but that's hard for him to do now.  (*Id.*)  He may write occasional notes of things he wants to put in his book.  (*Id.* at 1386.)  He plays video games but gets overwhelmed after 10-15 minutes, or he gets confused or starts forgetting things, or he has trouble concentrating.  (*Id.*)  When that happens, he gives up and watches TV.  (*Id.*)

15

- He has a cat that he spends his time with during the day, and petting his cat helps him calm down.  (*Id.*)  His cat is his only friend.  (*Id.*)  He has Twitter but doesn't really use it because it makes him stressed.  (*Id.*)

- He doesn't think he could a job counting nuts and bolts because he was unsure if he would be able to focus.  (*Id.* at 1387.)  He thinks he'd have trouble counting them because he is bad with numbers.  (*Id.* at 1388.)

The ALJ found no past relevant work.  (*Id.* at 1391.)  The ALJ then posed the following hypothetical question:

> For hypothetical #1, please assume a hypothetical individual of Claimant's age, education, relevant vocational background, can perform work at all exertional levels, but has the following non-exertional limitations.  He can perform simple, routine tasks, but not at a production rate pace.  For example, no assembly line or conveyor belt work.  And, can respond appropriately to occasional superficial interaction with supervisors, co-workers and the general public.  Superficial is defined as able to be in proximity of others, able to exchange greetings with others and engage in discussions that do not require the individual to resolve conflict among others or to perform team or tandem work with co-workers.  He can tolerate few changes in the work environment, defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any changes need to occur infrequently and be adequately and easily explained.  As I already mentioned, we don't have any past work, so I do not need you to evaluate for me if there's any past work that remains, but I would like you to list any jobs that exist in the national economy, with these limitations.

(*Id.* at 1391.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as hand packer, cook helper, and assembly.  (*Id.* at 1391-92.)

In response to questioning from Stoodt's counsel, the VE testified that a limitation that the work setting could not involve more than 10 people would impact the numbers for the jobs identified, but there would be no way for the VE to tell what numbers would be left.  (*Id.* at 1394-95.)  A limitation to one to three step tasks would eliminate the cook helper position.  (*Id.* at 1395.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.

17

*See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Stoodt was insured on the alleged disability onset date, June 30, 2017, and remained insured through June 30, 2021, the date last insured ("DLI").  (Tr. 1352-53.) Therefore, in order to be entitled to POD and DIB, Stoodt must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.

2.    The claimant has not engaged in substantial gainful activity since June 30, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.071 *et seq.*).

3.    The claimant has the following severe impairments: major depressive disorder; social anxiety disorder; panic disorder; obsessive-compulsive disorder; and unspecified mood disorder (2o CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform simple routine tasks but not at a production rate pace for example no assembly line or conveyor belt work.  And can respond occasionally to superficial interaction with supervisors, co-workers, and the general public.  Superficial is defined as

18

being able to be in proximity to others, exchange greetings with others, and engage in discussions that do not require the individual to resolve conflict among others or to perform team or tandem work with co-workers. He can tolerate few changes in the work environment, defined as routine job duties that remain static and are performed in a stable predictable work setting; any changes need to occur infrequently and be adequately and easily explained.

6.      The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on August **, 1992 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1355-65.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y*

19

*of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

20

Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In his sole assignment of error, Stoodt argues that the ALJ violated 20 C.F.R. § 404.1520c in evaluating the opinions of treating source CNP Conrad.  (Doc. No. 6 at 8.)  Stoodt asserts that the ALJ "was incorrect to simply dismiss" Conrad's opined limitations, "despite the ALJ's cursory declaration" that Conrad's opinions were inconsistent with and unsupported by the record.  (*Id.*)  Stoodt further argues "the lackluster reasoning provided by the ALJ failed to explain exactly how" Conrad's opinions were inconsistent with or unsupported by the record.  (*Id.*)  Stoodt maintains that his stability with medication was temporary, and the fact that he was stable at times supports Conrad's opinions instead of contradicting them.  (*Id.* at 10.)  In addition, Stoodt argues that the ALJ "failed to truly address" the support Conrad provided for the opined limitations.  (*Id.* at 11.)  Stoodt asserts that Conrad's treatment notes support her opinions.  (*Id.*)

The Commissioner responds that the ALJ evaluated Conrad's opinions in accordance with the regulations and that substantial evidence supports the ALJ's findings.  (Doc. No. 8 at 11.)  The Commissioner argues that the ALJ "sufficiently addressed" both the supportability and consistency of Conrad's opinions as required.  (*Id.* at 12-14.)  The Commissioner maintains that, reading the ALJ's decision as a whole, substantial evidence supports the ALJ's findings regarding Conrad's opinions, and Stoodt's arguments to the contrary "are unconvincing."  (*Id.* at 16-17.)

In reply, Stoodt argues that the ALJ failed to cite any specific record evidence in evaluating Conrad's opinions.  (Doc. No. 9 at 2.)  In addition, Stoodt maintains that the ALJ ignored the fluctuations of Stoodt's mental health symptoms.  (*Id.*)  Stoodt asserts that the Commissioner failed to recognize that these fluctuations are "consistent with a significant mental health impairment."  (*Id.* at 3.)

Since Stoodt's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5), 416.920c(a), (c)(1)-(5).

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).
[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

However, supportability and consistency are the most important factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she]

23

considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

At Step Two, the ALJ found as follows regarding Stoodt's mental impairments:

> In understanding, remembering or applying information, the claimant has a moderate limitation. Michael J. Wuebker, Ph.D., the psychological consultative examiner, stated the claimant demonstrated adequate insight and ability to make common sense judgment (Ex. 3F/6). According to Dr. Wuebker, the claimant followed directions and instructions during the assessment and appeared to be functioning in the average range of intelligence (Ex. 3F/7). Carly Springer, L.P.C., observed the claimant exhibited no impairment in cognition or intellectual functioning (Ex. 11F/14). He had normal cognition in July 2022 and October 2022, April 2023 and April 2024 (Ex. 19F/5; 22F/2, 10, 28). Hence, the claimant has no more than a moderate limitation in this area.
>
> **In interacting with others, the claimant has a marked limitation.** The claimant reports difficulties interacting with others and reports that he does not have any friends and he tends to keep to himself (Ex. 3F/6; hearing testimony). The claimant reported that he related adequately with his peers in school, though he stayed to himself. (Ex. 3F/3). Nevertheless, as chronicled in his treatment history and per his reports, the claimant has maintained a close relationship with his mother and interacts appropriately with medical providers. Dr. Wuebker noted the claimant maintained adequate eye contact, was cooperative throughout his interview, and interacted appropriately, although he appeared to become more anxious as the interview progressed (Ex. 3F). Treating providers described the claimant as pleasant and cooperative. Thus, he has no more than a marked limitation in this area.
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The record is devoid of any clinical findings or reported functional deficit to suggest ongoing difficulties in terms of concentration, persistence, or pace beyond a moderate level of difficulty. Dr. Wuebker stated the claimant had some troubles completing tasks as the claimant had to be redirected several times to questions at hand (Ex. 3F). However, this is contrasted by reports that the claimant is able to watch television, play video games, perform some chores around the house, and attend doctor's appointments independently (Ex. 3F; 12F). Hearing testimony indicated the claimant watches about four to five hours of television a day and he is able to

24

read comics and novels. He had normal attention in July 2022, October 2022, and in April 2023 and in April 2024, but he reported he was trying to write a book but could not concentrate to stay awake (Ex. 19F/5, 9; 22F/2, 10, 28). Therefore, he has no more than a moderate limitation in this area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reported that he was able to attend to various household duties, including dishes, laundry, cooking, housecleaning, and grocery shopping, which indicates no more the moderate limitations in this area (Testimony).

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 1356-57) (emphasis added).

Later in the opinion, the ALJ weighed and analyzed Conrad's opinions as follows:

Ashley Conrad, CNP, submitted several statements regarding the claimant's work-related capabilities (Ex. 13F; 14F; 20F; 23F). Some of her statements were on issues reserved to the Commissioner (Ex. 13F). The undersigned will not provide an analysis of statements on issues reserved to the Commissioner, as this evidence is neither valuable nor persuasive (20 CFR 404.1520b and 416.920b). Ms. Conrad opined that the claimant had "extreme" limitations in all areas of work-related social interactions but indicated that he would "do better" if able to "find a job with no contact with others" (Ex. 14F/1). **However, the claimant had reduced limitations in April 2024 to only marked impairment except in the way of responding appropriately to criticism, indicating he had been improving on his medications (23F).** She opined "extreme" limitations in working in cooperation or proximity to others without distraction, maintain attention and concentrate for more than brief periods, perform at production levels, respond to changes in work setting, behave predictably, and tolerate customary work pressures. She opined "marked" limitations in using appropriate judgment and carry out instructions and complete tasks; and "moderate" limitations in all other areas of mental

work-related functioning (Ex. 14F; 20F). **In April 2024, his limitations were noted less severe and only marked in maintaining attention and concentration and performing at production levels and responding to changes in a work setting, again indicating that he was improving on his medications (23F).** These opinions are generally inconsistent with and unsupported by the record as a whole, including the objective examinations of Ms. Conrad, which generally demonstrated that **while the claimant experienced mood fluctuations,** he was noted to be relatively stable with medication, as discussed in detail above. Memory testing showed no deficits, and while he did note difficulty with group social situations, examinations showed cooperative behavior and full orientation. The opinions of Ms. Conrad are found less persuasive, although her narrative statement regarding the claimant's work-related social interactions ("he would "do better" if able to "find a job with no contact with others"") has been incorporated into the residual functional capacity above.

(*Id.* at 1362-63) (emphasis added).

In contrast, the ALJ found the opinions of the state agency reviewing psychologists persuasive for the following reasons, a finding Stoodt does not challenge on judicial review:

State agency psychological consultants at the initial level of review opined that the claimant was able to complete short-cycle tasks in a setting without fast pace demand; should avoid large group interaction (10+ people); with brief, superficial interactions with others; within a set routine where major changes are explained in advance and gradually implemented to allow claimant time to adjust to new expectations; and was able to handle tasks without strict time limitations or production standards (Ex. 1A; 2A). At reconsideration, it was further opined that he could carry out one- to three-step short cycle tasks without strict production or pace requirements (Ex. 5A; 6A). These opinions are generally consistent with and supported by the record as a whole and are found overall persuasive. The language used in the prior administrative medical findings of short cycle tasks and brief superficial interaction are not vocationally defined, and thus, does not adequately articulate the limitation for use in a residual functional capacity assessment. The undersigned finds these prior administrative medical findings persuasive only insofar as they indicate that there are indeed some limitations in the areas of: understanding, remembering, and applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing oneself, as discussed above. And can respond occasionally to superficial interaction with supervisors, co-workers, and the general public. Superficial is defined as able to be in proximity to others, exchange greetings with others, and engage in discussions that do not require the individual to resolve conflict among others or to perform team or tandem work with co-workers. While the record did generally show stability with medications, the claimant required medication adjustments, at times, and reported some

residual anxious and depressive symptoms, warranting limitations, as specified within the residual functional capacity above, thus supporting this overall. Examinations of record generally showed intact memory, attention, and concentration, although he did require redirection, at times, and had difficulty in group social settings, but when his medication was managed and when he was fully compliant, he reported feeling better and doing well and was able to work on his book, exercise, and use a dating app, as was consistent with the record as explained above (17F, 21F).

(*Id.* at 1363-64).

In addition, elsewhere in the RFC analysis, the ALJ found as follows:

Consistent with his reports, the claimant presented on various occasions to several local emergency departments for management of his acute anxiety symptoms (Ex. 4F; 6F). **However, at that time, he did not follow up with outpatient follow up treatment recommendations. In 2014, the claimant admitted that he had ongoing anxiety and depression issues, but he had never seen a counselor for additional treatment (Ex. 8F/3).** Prior to his alleged onset date, in August of 2016, the claimant established treatment for complaints of anxiety, stress, and compulsive checking, along with difficulty focusing (Ex. 2F/13; 8F/3). He was prescribed medication (Ex. 8F/4-5). In November of 2016, the claimant reported that he felt well, and was doing well on medication, though he had some recently increased anxiety regarding family issues and deaths in the family (Ex. 8F/11). **Examination showed an improved mood with smiling, and it was noted that his medications were working well (Ex. 8F/13, 15, 19). Conservative treatment continued throughout the period at issue.** Shortly after his alleged onset date, the claimant reported that he was "doing fine," with controlled moods and no reported side effects (Ex. 8F/21). **Although worsening psychological symptoms were reported at times, these were addressed with medication adjustments.** For example, in September of 2016, follow-up notes show the claimant was doing "fair," but did not believe his medication was effective (Ex. 8F/9). He noted in June of 2017 that his medications were working well, with depression "a lot better" (Ex. 2F/9). Examination showed full orientation, good eye contact, good affect, and improved depression and anxiety (Ex. 2F/9). He requested a medication change in November of 2017, due to a side effect of increased appetite (Ex. 8F/25-26). **He was advised at that time to seek outpatient counseling services and was prescribed new medications to help with irritability and rage (Ex. 8F). Since that time, the claimant has taken appropriate medications for his alleged impairments, and the record shows that the medications have been relatively effective in controlling the claimant's symptoms.** The claimant described his medications as taking the "edge off" and indicate that "without meds, I would be a wreck" (Ex. 3F/4).

27

Psychological consultative examination was performed in June of 2018, by Michael Wuebker, Ph.D. (Ex. 3F). The claimant reported that he was unable to work due to depression and anxiety. He noted that his most recent job was temporary work from home, where he had no problems with attendance and was a "very hard worker," although he did have some problems staying focused if nervous. He was polite and courteous to others at work, he stated, and was usually able to complete work tasks. **He denied any current formal mental health care or history of psychiatric hospitalization, although he did participate in counseling as a child, and was prescribed medications by his primary care provider for mental health complaints. He noted that the medications were helpful. Examination showed cooperative behavior, adequate eye contact, normal speech, depressed mood, and restricted affect. He denied any hallucinations, and was full oriented**. The claimant reported that he enjoyed drawing and writing, and would spend the day watching television, playing with his cat, or sometimes looking for jobs. He was able to prepare simple meals, clean, and shop for brief intervals. He was diagnosed with major depressive disorder and social anxiety disorder (Ex. 3F).

In June 2018, the claimant had been taking medications for about 18 months. **At a follow up visit in July, the claimant's provider again recommended that the claimant establish more specialized mental health treatment (Ex. 8F/31-32). He did not establish formal mental health care until September of 2019 (Ex. 11F).** Records show that he worked with the therapist to develop social skills, express emotions, and improve daily functioning through healthy coping skills (Ex. 11F/1- 2). In December of 2019, the claimant reported that he had begun attending counseling, but continued to have some residual anxiety symptoms (Ex. 12F/1). His medications were changed (Ex. 12F/2). He established with a new provider in February of 2020, where examination demonstrated normal cognitive functioning, full orientation, normal memory and concentration, and intact judgment (Ex. 17F/258). He was cooperative, with an anxious mood, congruent affect, and denial of suicidal ideations (Ex. 17F/259). His medications were changed. He reported he had been doing some online freelance work until he had a falling out with his boss, after working there for 4.5 years (17F/260).

**Examination at a progress assessment in April showed appropriate grooming, cooperative behavior, normal speech, euthymic mood, full affect, logical thought processes, and appropriate insight and judgment (Ex. 15F/3).**

The claimant reported in June that his medication had been helpful, and he had experienced improvements in mood and anxiety (Ex. 15F/207; 17F/211). Examination showed euthymic mood with some residual anxiety, normal concentration and memory, and intact insight (Ex. 17F/209). **Continued improvements were noted in July, and he declined referral to psychiatry (Ex. 17F/189).** His medications were changed in August, as he noted residual anxious and depressive symptoms (Ex. 17F/181). In September 2020, he

agreed that he would start applying for jobs and did not want a job coach (17F/165-170). He reported he had a job at child support with his office in the basement and he did well but it was only a temporary job (17F/163-164).

In October of 2020, the claimant reported that he had been "about the same," with mood fluctuations and some residual anxiety (Ex. 17F/130). **Examination that month continued to show normal cognitive functioning, intact judgment and memory, anxious mood, and normal thought processes, with denial of suicidal ideations (Ex. 17F/128).** At a follow up in January of 2021, the claimant reported that he was doing "alright," with increased ability to overcome panic attacks, and noting that his panic attacks were "not anything serious…just some nerves" (Ex. 17F/100). **He was noted to be stable, so no changes were made to his regimen (Ex. 17F/102). Stability continued to be reported in March of 2021 and he reported he was going to try to start working out and he was working on his book again (Ex. 17F/63, 67, 72-73).** He noted some increased anxiety in June, and in July, he noted fluctuating but manageable moods (Ex. 17F/51). His medications were unchanged. By August, the claimant reported that he had been doing "very well," and felt good that some girls had 'liked' his photo on a dating app that he recently joined (Ex. 17F/42). In October, it was suggested that he try some vitamins before considering medication changes (Ex. 17F/30). At a follow up in March of 2022, examination showed normal findings (Ex. 17F/16-17). He noted that his panic attacks had been controlled (Ex. 17F/3). He reported doing ok and he felt that his increased Zoloft had been helpful in reducing his panic attacks (Ex. 21F/89, 93). He experienced some more situational anxiety in October 2022 waiting for an answer about his disability claim (Ex. 21F/79). In January 2023, the claimant shared with this provider that he was upset that he was not told that there was not enough evidence about his disability because he had not been going to counseling or seeing psychiatry (21F/68). At his follow-up in March 2023, his treatment notes indicated he had no psychological symptoms and his expression of emotions finding was normal (21F/65-66). He began feeling anxious again in his treatment notes in July 2023 and was depressed since his mom had been working all the time and he was by himself more and he felt his Social Security case was not looking good and it stopped working on his book and was eating more and hitting himself (21F/58). He was referred to mental health team (21F/61). In September 2023, the claimant planned on eating better and exercising and was going to continue to write his book and was starting on another medication (21F/50). Then in October 2023, he was feeling more optimistic and able to stay awake and exercise (21F/36). He reported that the medication had caused improvements in his mood and had been feeling good and that he is hungry and he was showering and doing stuff and had more energy in November 2023 (21F/26). His medication was once again increasing March 2024 because he had been feeling up-and-down and was missing appointments and was again lacking motivation and energy and not taking showers is often as well as overeating and binge eating (21F/14). He asked for another change in medication in April 2024 after feeling more

29

irritable with some fleeting suicidal ideations since his medication increase; he was to discontinue one medication and increase another medication (21F/2). **His treatment notes reported that he was not willing to consider any sort of psychiatry or willing to do counseling or willing to take a break from the Internet and was resisting any potential solutions to improve his mental health (21F/8).**

(*Id.* at 1359-61) (emphasis added).

In evaluating Stoodt's subjective symptoms, the ALJ found as follows – findings which Stoodt does not challenge on judicial review:

> In sum, the claimant's alleged social isolation and inability to concentrate or leave his home is not entirely consistent with the totality of the evidence. For example, when the claimant initiated mental health treatment in September of 2019, he indicated that it had been the first time in a month that he had left his home. However, he also reported reports that he was able to sleep through the night, had friends, and played video games more than four hours a day (Ex. 12F/4). In July 2018, the claimant followed up with complaints of chest pain secondary to anxiety attacks (Ex. 6F). However, mental status examination, showed the claimant was in no apparent distress. Examination showed cooperative behavior, appropriate grooming, and tangential speech, though he was agitated (Ex. 11F/14-15). Prior hearing testimony also indicated the claimant was able to watch four to five hours of television, read novels, prepare simple meals, clean and dress himself, as well as use a cell phone. Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment. The undersigned finds the claimant's ability to participate in such activities is not consistent with the degree of the claimant's allegations of functional limitations. There is no evidence of in-patient psychiatric hospitalizations, residential services, extensive case management services, or other intensive forms of intervention. His condition has generally remained stable and his treating providers have made conservative treatment recommendations. Accordingly, the record does not demonstrate that the claimant's mental impairments limit him so significantly that he would not be able to perform work at a competitive level. Additionally, the record as a whole supports the degree of limitations specified within the residual functional capacity above.

(*Id.* at 1361-62.)

The ALJ further found as follows:

> The undersigned has carefully considered the claimant's statements concerning his impairments and their impact on the ability to perform work activity and finds the allegations are somewhat inconsistent with the other

medical evidence of record. This is not to say that the claimant was symptom free, or did not experience difficulty performing some tasks. However, the record as a whole does not demonstrate the existence of limitations of such severity as to have precluded him from performing all work on a regular and continuing basis at any time from the alleged onset date of disability. Mental health records generally show good response to treatment and medications. The onset, nature, intensity, and duration of symptoms, as well as precipitating and aggravating factors, have all been factored into the residual functional capacity assessment set forth herein for this claimant (SSR 16-3p). Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of the evidence of record.

(*Id.* at 1364.)

The ALJ considered the supportability and consistency of Conrad's opinions as required by the regulations, discussing evidence that was unsupportive of disability in the process.  (*Id.* at 1359-64.) Reading the ALJ's decision as a whole, the Court finds the ALJ explained the reasoning for finding Conrad's opinions unsupported by and inconsistent with the record.

It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Stoodt would weigh the evidence differently, it is not for the Court to do so on appeal.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: September 4, 2025                           *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

31

## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**